ZANIC, P.J,
FINDINGS OF FACT
1. The parties are owners of contiguous parcels of land located in Case Township, Huntingdon County, Pennsylvania.
2. The parties trace their respective titles to the land owned by Solomon Mierley, who at his death, devised “my mountain land lying on Sidling Hill...” to his two sons, John and George Mierley. (Plaintiffs’ Exhibits 1 and 2).
3. The single parcel that Solomon Mierley devised to his sons contained approximately 19.47 acres (Plaintiffs ’ Exhibits 3,4,5), although the original subdivision which first described the property called for 18 acres and 40 perches. (Plaintiffs’ Exhibits 1 and 2).
4. In 1893 the Mierley brothers deeded a portion of this property (nine acres and the usual allowances) to Joshua Gosnell. The deed was recorded on July 17, 1893. This parcel is now owned by the plaintiffs. (Plaintiffs’ Exhibit 1).
5. Subsequently, George and John Mierley conveyed “nine acres and the usual allowances” to brother, George Mierley (deeded December 5, 1893, recorded April 4, 1900). This parcel is now owned by the defendants. (Plaintiffs’ Exhibit 2).
*515 6. The common boundary line dividing the properties in question is described in plaintiffs’ deed by the following call; “thence south 76 1/2 degrees east 17 perches to a stone heap, the place of beginning.”
7. The same line is described in the defendants’ deed by the following call: “thence by lands now or formerly of John Mierley, part of this survey, North 76 1/2 degrees West, 17 perches to a stone heap.”
8. The descriptions of the common line have been consistent in all of the conveyances since there was unity of ownership of the two properties over one hundred years ago.
9. The location of this common line is the issue in this case and was the subject matter of the testimony of the two experts.
10. In March of 1980, Lois O. Lucas (a predecessor in the plaintiffs’ title) hired Gary L. Young to survey what is now the plaintiffs’ land. N.T. at 16, 39, 49.
11. In March of 1980, Robert M. Mierley (defendants’ immediate predecessor in title) also hired Gary L. Young to survey what is now the defendants’ land. N.T. at 16, 39, 49.
12. In September of 2012, Kirby Lockard, a surveyor for Africa Engineering, was hired by defendants to prepare a survey of their land. N.T. at 66-67. Lockard testified as an expert witness for the defendants.
13. Surveyor John Young testified as the plaintiffs’ expert. He had assisted when his brother Gary Young conducted the 1980 surveys of both properties, and he performed a retracement survey of the Reed tract in 2005.
14. While both surveyors testified that the deed *516 descriptions of the line were problematic in locating the line in the field, each went about resolving the problem using different methods.
15. Although the original monument identifying Comer #1 was missing in 1980, both surveyors agree that the appropriate placement of Comer #1 is at the summit of Sidling Hill. In 1980 the Young survey set the undisputed Comer#![1]. N.T. at 18.
16. Both surveyors were able to locate and agree upon the location of Comers #2, #3, #4 and #5.
17. The difference in opinion between the surveyors comes down to the placement of the Comer #6 in 1980 (plaintiffs’ survey) and Comer #7 in 2012 (defendants’ survey).
18. The difference between Corners #6 and #7 creates a triangular area encompassing 0.624 acres.
19. In 1980 the Youngs were unable to locate the “stone heap” referred to in each of the deeds, and they placed what has now been referred to as Comer #6. The Youngs placed an iron pin in the location that they believed best replicated the location of the missing “stone heap.” N.T. at 18.
20. Not surprisingly, when completing a 2005 retracement survey John Young located Comer #6 in the same location where he and his brother had placed it when they performed their 1980 Surveys. N.T. at 32, 36, 95.
*517 21. In their 1980 surveys of the properties at issue, the Youngs changed the bearing and direction of the dividing line in question in an effort to reconcile the distance and area of their surveys to compensate for the missing “stone heap.” N.T. 31.
22. John Young testified that he and his late brother thought “that the distances and the areas of the tracts... lended a lot more evidence to the position of that comer than what the direction did.” N.T. at 31.
23. The Young surveys therefore adjusted the bearing (angle) of the line and its direction in order to accommodate the area.
24. Kirby Lockard of Africa Engineers and Land Surveyors, Inc. discovered the 1980 surveys of the two properties when conducting research in preparation for his survey performed for defendants in 2012. N.T. at 71.
25. In the process of conducting his 2012 survey, Lockard came to the conclusion that Comer #6, as identified by the 1980 surveys and 2005 retracement survey, was not in accord with the defendants’ deed. N.T. at 69.
26. In an effort to compensate for the missing “stone heap,” Lockard maintained the bearing and direction of the lines in question and changed the distances and adjusted the acreage to establish the boundary line. N.T. 74-75.
27. The location of Comer #7 was established by Lockard by holding the deed angle off of the line on top of Sidling Hill. N.T. 72.
28. The angle created between the two lines connecting Comers #1 and #2 and connecting Comers #1 and #7 is precisely the angle called for in each deed. N.T. at 72-75.
29. When reconciling boundaries, the general order of *518 priority is to be given first to valid monuments, next to directions, then to distances and lastly to area. N.T. at 49-51,64,82, 84-88.
30. The general order of priority should be disregarded when the errors are large or the measurements are obviously incorrect. In such a case, other evidence should prevail over the order of priority. N.T. at 87.
31. No credible evidence has been presented to indicate that the general order of priority should be dismissed in favor of an exception.
32. Comer #7, placed in 2012, is the factually correct location for the terminus of the boundary line dividing the properties owned by plaintiff and defendant.
33. Comer #6, placed in 1980, is a factually incorrect location for the terminus of the boundary line dividing the properties owned by plaintiff and defendant.
34. No credible evidence was presented as to a dispute or an agreement between Lois O. Lucas and Robert M. Mierley (who owned the respective properties in 1980) regarding the boundary line.
35. The 1980 surveys prepared by the Young brothers were never recorded.
36. The properties in question were conveyed on several occasions after 1980, however, the deed descriptions conveying the properties did not utilize the surveys to reform the metes and bounds descriptions of the property.
DISCUSSION
We are called upon to decide a Cass Township, Huntingdon County, Pennsylvania boundary line dispute which arises from credible attempts by long-time Huntingdon County surveyors to reconcile the location *519 of the line that separates two properties. Both surveyors were accepted by the court as expert witnesses, and each persuasively justified their positions as to the location of a disputed “comer.”
The boundary line fray began in October of 2012 when plaintiff, Gregory R. Reed,[2] became aware of a railroad spike driven into Dirt Mountain Road which indicated to him the “repositioning” of the comer at the heart of this dispute. We learned at trial that the repositioned comer had been marked with the spike by Kirby Lockard of Africa Engineers and Land Surveyors, Inc. Lockard had conducted a survey for the defendant, Eric L. Nicarry, on September 26, 2012. At the time Gregory Reed encountered the railroad spike, he also encountered “no trespass” signs in an area that he believed he owned.
The Reeds, until this point, were under the assumption that the correct location of the southwestern comer of their property and the northwestern comer of the Nicarry property had been established in 1980 when Gary Young performed surveys on both properties in question. Lockard’s survey in 2012, however, placed the disputed comer for the line in a different location. The difference between the two disputed comers, placed more than three decades apart, creates a triangular piece of wooded mountain ground which amounts to approximately .624 acres. N.T. 86. Plaintiffs’ claim this triangular area and seek to eject defendants from the .624 acre piece of land.
We start our analysis by recognizing that the amended complaint pleads both an action in ejectment and an action to quiet title. Our first job is to decide which action is appropriate. An action to quiet title is an action at law which *520 is subject to Pennsylvania Rule of Civil Procedure 1061. Conversely, ejectment is a possessory action wherein a plaintiff must prove the right to exclusive possession visa-vis proof of paramount title. Sutton v. Miller, 405 Pa. Super. 213, 592 A.2d at 89 (citing Dorman v. Brogan, 405 Pa. Super. 254, 263, 592 A.2d 104, 108 (1991)).
We are bound by the Superior Court’s holding in Plauchak v. Boling, 439 Pa. Super. 156, 653 A.2d 671 (Pa. Super. 1995) that “[i]t is procedurally improper to simultaneously commence both an action in ejectment and an action to quiet title regarding the same parcel of real estate.” Id. at 674. “Permitting an out-of-possession plaintiff to maintain an action to quiet title is impermissible because it constitutes an enlargement of the plaintiff’s substantive rights as defined by statute, and thus exceeds the court’s jurisdiction to proceed.” Id. citing Sutton v. Miller, 405 Pa. Super. 213, 592 A.2d 83, 88-89 (Pa. Super. 1991).
We are further advised that when an action in ejectment is maintained in conjunction with an action to quiet title, the proper course of action is to proceed solely on the action in ejectment. See Moore v. Duran, 455 Pa. Super. 124, 687 A.2d 822, 827 (Pa. Super. 1996), appeal denied, 549 Pa. 703, 700 A.2d 442 (1997); Riverwatch Condo. Owners Ass’n v. Restoration Dev. Corp., 931 A.2d 133, 141 (Pa. Commw. Ct. 2007). As such, we are obliged to review the evidence based on the plaintiffs’ theory of ejectment.
The plaintiffs’ burden in an action in ejectment at law is clear: they must establish the right to immediate exclusive possession. See, e.g., Hallman v. Turns, 334 Pa. Super. 184, 482 A.2d 1284, 1287 (1984); Harbor Marine Co. v. Nolan, 244 Pa. Super. 102, 366 A.2d 936 (1976). Additionally, recovery can be had only on the strength of their own title, not the weakness of defendants’ title. See *521 Artz v. Meister, 278 Pa. 583, 123 A. 501 (1924); Ratajski v. West Penn Manufacturing & Supply Corp., 198 Pa. Super. 588, 182 A.2d 243 (1962). The root of an ejectment action, therefore, rests with the plaintiffs’ ability to identify, by a preponderance of the evidence, the boundaries of a parcel of land to which they are out of possession, but for which they maintain paramount title. Doman v. Brogan, 405 Pa. Super. 254, 263, 592 A.2d 104, 108 (Pa. Super. Ct. 1991). Plaintiffs have proffered two arguments in support of their claim of ownership.
The Reeds primary argument is that “the westernmost common comer [Comer #6] was established by agreement in 1980.” The core of their position is that the location of the line was established and agreed upon by the predecessors in title in 1980 when the Youngs surveyed both properties at the request of the then owners. As such, the Reeds contend that all predecessors in title are bound by the comer established by the Young surveys.
There is no dispute that in 1980 Gary Young established the comer for the boundary line in question. What is disputed is whether the Nicarry’s are bound by the placement of that comer. Plaintiffs repeatedly contended that the 1980 surveys indicate an agreement between the then land owners concerning the location of Comer #6. The plaintiffs’ argument invokes the doctrine of consentable lines.
The fundamental principles of the doctrine of consentable lines trace their Pennsylvania roots to justice Gibson’s opinion in Perkins v. Gay, 3 Serg. & Rawle 327 (Pa. 1817). Justice Gibson opined that “[t]he establishment of this kind of boundary is always a matter of compromise in which each party supposes he gives up for the sake of peace something to which in strict justice he is entitled. There is an express mutual abandonment *522 of their former rights, upon an agreement that, whether they be good or whether they be bad, neither is to recur to them on any pretense whatever, or claim anything that he does not derive from the terms of the agreement. Each takes his chance of obtaining an equivalent for everything he relinquishes, and, if the event turn out contrary to his expectations, so much the worse for him. If there be no intention of fraud, no unfair dealing and neither party has more knowledge of the fact misconceived than the other had, the contract will bind.” Id. at 332.
The Superior Court has clarified that a consentable line could be established in two separate and distinct ways: by dispute and compromise or by recognition and acquiescence. Both methods of proving a consentable line were reviewed in Inn Le’Daerda, Inc. v. Davis, 241 Pa. Super. 150, 360 A.2d 209 (Pa. Super. Ct. 1976). First, the court explained the dispute and compromise method could be established by proof of the following facts:
“(1) a dispute with regard to the location of a common boundary line,
(2) the establishment of a line in compromise of the dispute, and
(3) ‘the consent of both parties to that line and the giving up of their respective claims which are inconsistent therewith.’ Newton v. Smith, 40 Pa. Super. 615, 616 (Pa. Super. Ct. 1909).” Inn Le’Daerda, Inc. v. Davis, 360 A.2d at 215.
Plaintiffs present no evidence to establish the first prong of a consentable line. There was no admissible, credible evidence that established a dispute regarding the subject properties in 1980. Plaintiffs attempt to create facts by asserting that “[t]o avoid litigation and confusion Lois O. *523 Lucas and Mr. and Mrs. Robert M. Mierley entered into their own alternative dispute resolution arrangement. They hired one surveyor.” (Plaintiff’s memorandum in support of proposed findings of fact and proposed conclusions of law P.4). This statement is not only a stretch, but it attempts to either manufacture or argue facts not in evidence. While the parties may have hired a surveyor to plot their land, any suggestion that the surveyor was settling a dispute is imagined.
Although plaintiffs failed to prove a consentable line by evidence of dispute and compromise, they can still prove a consentable line by means of recognition and acquiescence. Evidence of recognition and acquiescence requires a two-pronged test. Corbin v. Cowan, 716 A.2d 614 (Pa. Super. 1998). First, there must be a finding that each party involved has claimed the land on his side as his own. The second prong requires a finding that “occupation” occurred for the statutory period of at least twenty-one (21) years. Our courts have long recognized that a boundary line may be established by a long-standing fence without proof of a dispute and its settlement by a compromise. In Dimura v. Williams, 446 Pa. 316, 286 A.2d 370 (1972), the court noted that: “It cannot be disputed that occupation up to a fence on each side by a party or two parties for more than twenty-one years, each party claiming the land on his side as his own, gives to each an incontestable right up to the fence, and equally whether the fence is precisely on the right line or not.” Id. 446 Pa. at 319, 286 A.2d at 371, quoting Brown v. McKinney, 9 Watts 565, 567 (Pa. 1840).
In such a situation, the parties need not have specifically consented to the location of the line. Dimura v. Williams, supra [446 Pa.] at 319, 286 A.2d at 3 71. It must nevertheless appear that for the requisite twenty-one years, a line was recognized and acquiesced to as a boundary by adjoining *524 landowners. See Miles v. Pennsylvania Coal Co., 245 Pa. 94, 91 A.211 (1914); Reiter v. McJunkin, 173 Pa. 82, 33 A. 1012 (1896). Niles v. Fall Creek Hunting Club, 376 Pa. Super. 260, 545 A.2d 926 (Pa. Super. Ct. 1988) (en banc).
Most telling in plaintiffs’ attempt to establish recognition and acquiescence is their failure to prove that the line established in 1980 was ever recognized by anyone other than the plaintiffs in 2005. The 1980 surveys were never recorded, nor did any subsequent deed description ever refer to the 1980 surveys. The property now owned by the Reeds was transferred in 1993, 1994 and again when the Reeds took title in 2000. The Nicarry property was transferred in 1986, 2004, 2006, 2008 and finally to the Nicarrys in 2012. There was never an indication in any of those deeds of the 1980 created boundaries. In fact, the deed descriptions today mirror those from 1883.
This circumstance is not as if there is a fence or a wall dividing two properties in the middle of a neighborhood or in the city for all to see. These properties are in rural Huntingdon County in the woods.[3] We cannot make a finding of recognition and acquiescence when plaintiffs have failed to present any credible evidence that the predecessors in title of either property acknowledged the line in question. The argument seems to be “if no one objected to the surveys, then everyone must have acknowledged and agreed with the survey.” This theory would contradict the long held legal tenant that the plaintiff has the burden to prove their case, and they may not do so through mere speculation.
*525 Plaintiffs have failed to prove a consentable line by either the methods of “dispute and compromise” or “recognition and acquiescence,” and as such, the plaintiffs’ first argument is rejected.
Plaintiffs next argue in the alternative that “the most accurate location for the westernmost common comer is where it is shown on the 1980 Mierley survey and 1980 Lucase survey.” They argue that even if a consented line was not created then the correct location for the placement of the disputed comer and line is through the use of the comer established in 1980.
To establish which comer placement is correct we must endorse one method over the other. Both experts acknowledged their reliance on the text, Boundary Retracement Principles and Procedures for Pennsylvania by Knud Hermanson. The experts agreed that when retracing and relocating lines that are described in deeds there is a priority that is to be followed. Each expert testified that the boundary retracement order of priority is (1) monuments, (2) angles or the directions of the lines, (3) distances along those lines, (4) area. N.T. 49-51, 64, 82,84-88. See also, Baker v. Roslyn Swim Club, Pa. Super. 192, 198 (1965).
There is no dispute that the two surveyors agree as to the common comer identified as Comer #1, located at the summit of Sidling Hill. The surveyors chose different methods, however, in establishing the comer at the bottom of the hill nearest to Dirt Mountain Road. When the plaintiffs’ property was surveyed in 1980, the surveyor changed the bearings as set forth in each deed and attempted to reconcile the distances called for in those deeds. When the defendants’ property was surveyed in 2012, the surveyor held to the bearings called for in the deeds and instead adjusted the distances accordingly.
*526 Kirby Lockard, the expert surveyor hired by the defendants to conduct the 2012 survey, maintained the bearing or direction called for in the deeds and ran the boundary line to the point where it intersected the western line of the properties to establish the comer. As such, Lockard appropriately followed the priority in retracement principles by maintaining direction over distance.
In 1980, however, the plaintiffs’ surveyor changed the direction of the line to establish the comer. There is no dispute that directions should be given priority over distance and area. While plaintiffs acknowledge this fact, they argue that an exception to this protocol exists, and when “errors are large or measurements are obviously incorrect, distances and directions are to be corrected by other evidence or disregarded in favor of other evidence.” (Plaintiffs’ memorandum in support of proposed findings of fact and proposed conclusions of law P.16). While this exception may be an accurate statement based on surveying principles, plaintiffs have failed to present credible evidence to compel our application of the exception.
In support of this argument, plaintiffs assert in bold type that “The Youngs were trying to find the location of the common boundary line that gave each brother ‘9 acres with the usual allowances’” (Plaintiffs’ memorandum in support of proposed findings of fact and proposed conclusions of law P.17). Plaintiffs misstate the facts. Prior to subdivision, the entire tract was one 19.87 acre piece of property which was bequeathed to John and George Mierley as joint tenants in common. (Plaintiffs Trial Exhibit 1.) The brothers therefore owned the entire property together which clearly was the intent of their father in his will. The property was not subdivided until the brothers deeded off a portion of the property to a third party in 1893. This property became the (Reed) tract now *527 owned by plaintiff. (Plaintiffs’ Exhibit 1).
Plaintiffs nonetheless argue that the original intent of the parties was for both tracts to be equal. No evidence supports this claim.
We would be remiss if we failed to discuss a tactic attempted by plaintiffs. In plaintiffs’ memorandum in support of proposed findings of fact and proposed conclusions of law, they argue facts that are not in evidence by inserting an article that was never presented in court. While it is surely appropriate to vociferously argue a point, it is just as inappropriate to attempt to present inadmissible evidence to the fact finder.
In their memorandum, plaintiffs cite an alleged article entitled “GPS and Boundary Retracement” (Plaintiffs’ memorandum in support of proposed findings of fact and proposed conclusions of law P. 9) in an endeavor to discredit the procedures undertaken by the surveyor employed by defendants. This article was not presented in court and had never been referred to in any pleadings or testimony. Plaintiffs attempt to present this in argument is inappropriate and confounding. To allow a litigant to present alleged documentation that was not presented in court, and which has not been subjected to cross-examination, would be error. Such a maneuver would render trials and the presentation of properly presented evidence meaningless.[4] In fact, we cannot be certain where this article was found and we cannot be certain of the context, as the plaintiffs have taken a single paragraph out of the alleged article. While we acknowledge that the author of this injected article was cited by both expert *528 surveyors for the purpose of establishing their methods for creating an order of priority in re-establishing boundaries, neither referred to an the article entitled “GPS and Boundary Retracement.”
Had this article been offered in court, without the author’s testimony, most likely we would have deemed the article inadmissible. Authoritative texts can only be offered as non-hearsay for the purpose of bolstering the credibility of an expert witness implicitly suggesting that this purpose differs from the impermissible objective of attempting to prove the truth of the matter asserted. Aldridge v. Edmunds, 561 Pa. 323, 750 A.2d 292 (Pa. 2000). When offered at a trial to establish principles or theories from their contents, texts and periodicals fall within the traditional definition of hearsay — an extrajudicial declaration offered to prove the truth of the matter asserted. See Majdic v. Cincinnati Machine Co., 370 Pa. Super. 611, 621-22, 537 A.2d 334, 338-39 (1988) (en banc). There is no question that if published material is authoritative and relied upon by experts in the field, although it is hearsay, an expert may rely upon it in forming his opinion; indeed, it would be unreasonable to suppose that an expert’s opinion would not in some way depend upon the body of works preceding it. Pennsylvania courts have thus permitted, subject to appropriate restraint by the trial court, limited identification of textual materials (and in some circumstances their contents) on direct examination to permit an expert witness to fairly explain the basis for his reasoning. See P.R.E. 705 (providing that “the expert may testify in terms of opinion or inference and give reasons therefor”); see also In re C.R.S., 696 A.2d 840, 845 n.7 (Pa. Super. 1997).
Both the plaintiff and defendant presented experts in the field of surveying. They were each asked questions relating *529 to the order of priority when performing a retracement survey. (N.T. 49-51, 81-83). The experts agreed that the standard in their industry was enunciated in Knud Hermanson’s book, Boundary Retracement Principles and Procedures in Pennsylvania. Both attorneys appropriately discussed Mr. Hermanson’s methods, not for the purpose of establishing the truth of the matter, but for the purpose of each surveyor explaining the procedures that he uses when confronted with a retracement situation.[5]
Subject to control by the trial court, judicious use of learned treatises may be undertaken on direct examination of an expert witness in appropriate circumstances for the limited purpose of explaining the basis for the opinion. We have permitted such testimony as it relates to properly adduced testimony, however, we have disregarded the arguments presented by plaintiffs which rely on the inappropriately inserted article.
Plaintiffs’ have the burden to prove their right to immediate exclusive possession on the strength of their own title, not the weakness of defendant’s title. They have failed to establish by a preponderance of the evidence that the 1980 surveys and the 2005 retracement survey identify the correct boundary dividing the properties of plaintiffs and defendants. The evidence establishes that plaintiffs are out of possession, and that the defendants have paramount title to the 0.624 acres in question. Plaintiffs have failed to meet their burden, and accordingly we will enter judgment in favor of defendants.

. During the course of the trial, counsel and witnesses placed marking on 24”x 36” poster board exhibits which ultimately were admitted into evidence by plaintiff. These marking were added for demonstrative purposes during testimony, and the witness and counsel referred to the markings as “comers” #1 through #7. The labeled comers Identified are not part of the original documents. Also admitted into evidence were the identical original sized documents which were presumably used to create the poster boards.

. Plaintiff Gregory R. Reed, esquire, represented himself and his wife throughout this litigation.

. We face a situation that brings to mind the age old question “if a tree falls in a forest and no one is around to hear it, does it make a sound?” To analogize, if an iron pin with stones around it was placed in the woods and no one recorded its existence, does it exist as consentable line?

. Imagine the free-for-all potential for closing arguments that would come into play if courts were to permit such methods. Attorneys would be free to argue in closing to a judge or jury “I Googled it, and I found an article, so it must be true.”

. In his proposed findings of fact, counsel for defendants attached a page from Hermanson’s Boundary Retracement Principles and Procedures. This document is also hearsay. But it is appropriate, not for the truth of the writing, but to illustrate the methods that each expert employed in proceeding with their surveys. Both surveyors testified to the method of establishing priority in boundary retracements based on the attached portion of the Hermanson text.