Vajentic Estate.

Argued March 12, 1973. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

*John A. Metz, Jr.,* with him *Samuel V. Albo,* and *Metz, Cook, Hanna & Kelly,* for appellants.

*Louis Z. Marohnic,* for appellees.

OPINION BY MR. JUSTICE EAGEN, July 2, 1973:

Anton Vajentic [decedent], a resident of Pittsburgh, Allegheny County, died January 8, 1968. He was a widower, without children, and his nearest blood relatives were a niece, Jelica Santulin, and a nephew, Anton Vajentic, a resident of Yugoslavia. By his will dated December 7, 1967, he bequeathed the sum of $1000 each to a grand niece and a grand nephew of his deceased wife, and $5000 each to Maria and Rita Santulin, minor children of his niece, Jelica, and her husband, Joseph. He devised his residence property at 202 Chester Avenue, Pittsburgh, to his niece, Jelica, for life and upon her death to her daughters, Maria and Rita. The residue of the estate [approximately $29,000 in personalty] was left to his nephew, Anton.

Decedent's will was probated and letters testamentary issued on January 18, 1968. On November 12, 1968, Jelica Santulin presented a petition to the court setting forth the terms of decedent's will in regard to the Chester Avenue property and asking permission to sell the property for $12,000. The petition stated the petitioner and her family were induced to come to Pittsburgh from Italy, but now found it more advantageous to live in New York City. The petition was granted and the proceeds of the sale were directed to be held in trust for petitioner for life and to be paid to her children upon her death.

On February 28, 1969, the executor filed a first and final account. On March 24, 1969, Jelica Santulin and her husband, Joseph [appellants], filed a claim against the estate for $12,000. The basis of the claim was not stated. On August 6, 1969, appellants filed a formal statement of their claim in which it was alleged, in pertinent part, that in September and October 1966, decedent visited appellants who were then living in Astoria, New York, and promised if they would come to Pittsburgh and live with him "he would turn over his property [estate] to them"; that relying on decedent's promise, they moved to Pittsburgh on December 6, 1966, and lived with him until his death; and that contrary to his promise decedent made the will, before outlined. In this statement, damages in the amount of $12,000 were requested. On June 9, 1970, an amended statement of claim was filed containing the same averments, but asking that appellants be awarded the entire estate of decedent. An evidentiary hearing ensued before the Honorable Malcolm HAY, the auditing judge, who later entered an adjudication and decree nisi, sustaining the claim and awarding decedent's entire estate to appellants.

The nephew, Anton Vajentic, and other beneficiaries under the will, filed exceptions to the above decree, and,

after argument before a court en banc consisting of President Judge BOYLE and Judges RAUHAUSER and McKENNA [Judge HAY died in the meantime], these exceptions were sustained, and a new decree of distribution was entered awarding the estate in accordance with the terms of decedent's will. This appeal followed.

The evidence offered by appellants at the hearing before the auditing judge consisted of letters written by decedent to appellants; testimony of three witnesses of declarations made by decedent in the absence of appellants; and the testimony of one witness in the form of answers to interrogatories of declarations made by decedent on six or seven different occasions in the presence of appellants. This evidence may be summarized as follows:

In March 1966, decedent wrote a letter to appellants who then lived in Capua, Caserta, Italy, which said in part: "You know I am all alone. I have no one anymore but you. If it would be possible for you to come here to Pittsburgh, I have a house which I would give you and plenty of money. But I would want to live with you and would turn my property over to your name."

In July 1966, decedent wrote a second letter to appellants in Italy, which said: "As soon as you find out when you can come here I will buy everything necessary and will send you money to New York as much as you will need. You know that I would like you to come to Pittsburgh, but if you wish to stay in New York I will come to New York and buy you a house there and give you all the money you need."

At or about the time the foregoing letters were forwarded to appellants, decedent discussed the matter with friends in Pittsburgh. To one such individual, he said "he would like to have them [appellants] here to live with him, that he would make a home for them if they would come and stay there . . . if they would come

here, he would make a home for them, turn the house over to them and his possessions."

To a second friend, decedent said "he wanted to bring them to Pittsburgh to make a home for him . . . he was going to give them the house on Chester Avenue and also money with it."

To a third friend, decedent said if appellants came to live with him "he would give them the house, furnish it, pay the bills and after he died he would leave them the estate as long as they took care of him."

On August 24, 1966, appellants came to the United States and took up residence in Astoria, Long Island, New York. Between August 29th and December 6th, decedent wrote seven letters to appellants in Astoria in which he urged them to come and live with him in Pittsburgh. In one of these letters, decedent said "I had an empty house which was waiting for you. My house is your house. You need pay no rent to no one and I have money in the bank." In another of these letters, decedent enclosed a check for $200 and in another a map.

In September 1966, decedent traveled to New York and lived with appellants for a period of forty days. On six or seven occasions during this period, he asked appellants, in the presence of Matteo Santulin, a brother of Joseph Santulin, to "move with him to Pittsburgh, Pennsylvania", and if they would "he would leave his estate" to them.

Appellants moved to Pittsburgh on December 6, 1966, and lived with decedent in his Chester Avenue residence from that date until his death. During this period decedent purchased new furniture and paid for everything necessary to maintain himself and the Santulin family. Shortly after decedent's death, appellants moved back to New York and took the furniture with them.

6

As noted before, the decree of the hearing judge was reversed by the court en banc, the members of which did not participate in the hearing. Unquestionably, a court en banc may reverse the chancellor in a proper case, but if this occurs, the court en banc must state its reasons for so doing, and it is the duty of the appellate court to carefully examine these reasons, together with the entire record, and determine if the action of the court en banc was justified. See *Billinger Estate,* 451 Pa. 77, 301 A. 2d 795 (1973).

The record indicates that one, if not the main reason, why the court en banc reversed the hearing judge was it refused to believe the testimony of Matteo Santulin as to the declarations allegedly made by decedent while visiting appellants in New York.

The testimony of this particular witness was crucial to appellant's case. In order to establish a contract to will in a certain manner, it is necessary, inter alia, to prove the parties to the contract were brought together face to face and repeated the bargain in each other's presence. Statements or declarations made by decedent outside the presence of appellants do not establish such a contract, but are admissible as corroborative evidence. *Fahringer v. Strine Estate,* 420 Pa. 48, 216 A. 2d 82 (1966). Hence, unless the testimony of Matteo Santulin is accepted, the alleged contract was not established.

While the auditing judge did not specifically say he found the facts testified to by Matteo Santulin to be true, his final conclusion and decree nisi compels this to be so. Such a finding is ordinarily entitled to great weight and should be rejected only in a clear case and only for good and sufficient reason. *Belmont Laboratories, Inc. v. Heist,* 300 Pa. 542, 151 A. 15 (1930). However, where a finding of fact of the chancellor is based on the testimony of a witness he did not see or hear, this finding of fact is not entitled to the same weight. Cf. *Stanko v. Males,* 390 Pa. 281, 135 A. 2d 392

(1957). In such an instance, an appellate court is equally competent to form an opinion as to the truthfulness of this witness after examining his or her testimony in connection with the whole record. See *Stanko v. Males,* supra. Since the testimony of Matteo Santulin was in the form of answers to interrogatories, this is such a case. Having closely examined his testimony, together with the entire record, we conclude the court en banc below properly rejected his testimony.

We note first that, while contracts to make a will in a certain manner, are recognized in Pennsylvania, such contracts are viewed "with misgivings and suspicion". *Fahringer v. Strine Estate,* supra. As we said in *Fahringer,* at page 52: "A contract to make a will in a certain manner or to bequeath by will a specific monetary sum is recognized in Pennsylvania as valid, provided the *creation* of such contract and its *terms* are proven with clarity and conviction and valid consideration shown [cites omitted]. However, because resort to such contracts represents an effort to effect a distribution, either in whole or in part, of the estate of a decedent in a manner different than the orderly procedure of a will—the stringent requirements of which have been set forth by the legislature—and because of the opportunity such alleged contracts afford for the presentation of false and fraudulent claims, traditionally the courts have been reluctant to give recognition to such contracts and have viewed claims based on such contracts with misgivings and suspicion". [Emphasis in original.]

To us the testimony of Matteo Santulin is unpersuasive when considered with these facts:

(1) In the letters from decedent to appellants the decedent never promised or indicated he would will appellants his entire estate, but merely that he would turn over his dwelling house to their name with plenty of money, and the decedent kept this promise; (2) By

his will decedent indicated his understanding of the bargain he made with appellants; (3) On November 12, 1968, or eleven months after decedent's death one of the appellants impliedly recognized decedent's will by petitioning the court for permission to sell the real estate devised by decedent's will; (4) The contract appellants allege was not asserted until sixteen months after decedent's death; (5) The hearing on the claim here involved took place on September 9, 1970, two years and eight months after decedent's death. The evidence on this occasion in support of the claim consisted of the letters written by decedent to appellants, as before related, plus the testimony of the three witnesses to whom decedent made material declarations in the absence of appellants. The hearing was then continued. On two subsequent dates, the court was ready to proceed, but further continuances were made necessary because Matteo Santulin failed to appear. Finally, on February 11, 1971, his answers to interrogatories were filed in the office of the register of wills. These were made part of the instant record on April 2nd. Since the witness was a resident of the State of New York, he could not be compelled to appear and no cross-examination occurred.

After considering the whole record, we are satisfied the claim of appellants should be denied.

Decree affirmed. Costs on estate.

Mr. Justice MANDERINO dissents.