## Rust Estate

*Joseph E. Lastowka, Jr.*, for claimant.

*Robert L. Freedman*, for executors.

*John S. Halsted*, for petitioners.

184

OPINION BY WOOD, J., SEPT. 10, 1980:

Counsel have presented to us for decision two questions which are old and familiar ones to those whose daily fare consists largely of estate settlements. We are asked to decide whether claimant Erma (Petey) Moore has shown that a contract subsisted between her and decedent Frances duPont Rust, under which Mrs. Rust would leave her shares of stock in Frances, Inc. to Mrs. Moore. (As a sort of sub-issue, we are asked to decide whether Mrs. Rust, on behalf of the corporation Frances, Inc., agreed that the corporate assets would be turned over to Mrs. Moore at Mrs. Rust's death). The second familiar issue before this court is whether Mrs. Moore, who is the only surviving party to the alleged contract, may testify as to its existence.

After hearing, we make the following:

*Findings of Fact*

1. Frances, Inc. is a corporation of which Frances duPont Rust, decedent, was sole owner. It was formed in February of 1960.

2. Shortly after the formation of the corporation, claimant Erma Moore began employment with the corporation, for which she received a salary and a 3% commission on sales. Mrs. Rust also paid her $200 per month from her personal funds.

3. Mrs. Moore's husband William suggested to Mrs. Moore that she not commence employment with Mrs. Rust unless she got something more substantial than a straight offer of salary.

4. Mrs. Moore chose to enter Mrs. Rust's employment, and thereafter Mrs. Rust said to Mr. Moore that she would turn the business over to Mrs. Moore if anything happened to her (Mrs. Rust), and also confirmed to Mr. Moore that a telephone call from a lawyer was placed in order to learn the spelling of Mrs. Moore's name so that her name could be placed in Mrs. Rust's will.

5. Mrs. Rust thereafter prepared a will in which her corporate shares in Frances, Inc. were left to Mrs. Moore, but Mr. Moore did not see a copy of this will until after it was produced as part of the instant litigation.

6. Mrs. Rust also confirmed to Mrs. Moore from time to time that she would be left the business.

7. Mrs. Rust died on January 27, 1975, a resident of this county, leaving a will dated April 30, 1973. At the time of her death, her assets included 65 shares of stock of Frances, Inc., which were bequeathed in the 1973 will to her daughter, Carroll Carpenter.

8. Mrs. Moore had worked continuously for Frances, Inc. from 1960 up until the time of Mrs. Rust's death, and for a couple of months thereafter. During that time, she had achieved a couple of increases in her base salary. ($50 per week when she started, $85 per week at Mrs. Rust's death).

9. On March 13, 1975, Mrs. Moore attended a meeting at Mrs. Carpenter's house, at the latter's request. Also present were William Shore, a corporate accountant for Frances, Inc., and Ned Carpenter, husband of Carroll Carpenter.

10. At this meeting, Carroll Carpenter, acting as the new principal officer of Frances, Inc., advised Mrs. Moore that her employment with Frances, Inc. was terminated, and offered her the sum of $15,000 in recognition of her years of service.

11. Mrs. Moore was upset, and did not respond affirmatively to Mrs. Carpenter's suggestion, nor did she at that time suggest that she herself was the owner, or entitled to be the owner of Frances, Inc.

12. Following probate of the will, the executors delivered the shares of stock to Carroll Carpenter, who also invested further sums of money and secured additional shares of stock from the corporation.

13. Approximately one year following Mrs. Rust's death, an attorney acting on Mrs. Moore's behalf informed Ned Carpenter that Mrs. Moore claimed the shares of Frances, Inc., on the basis of an agreement dating back to 1960. A formal claim was filed January 27, 1976.

## Discussion

We might note at the outset, in order to get certain underbrush out of the way, that there is no evidence whatsoever that the corporation, as part of its employment agreement with Mrs. Moore, agreed to transfer its own assets to Mrs. Moore. Rather, the questions we must decide are: was there an agree-

ment by Mrs. Rust to will the shares to Mrs. Moore, and is Mrs. Moore's testimony to that effect competent in this hearing? We feel that we must resolve both questions against Mrs. Moore's claim.

Contracts to make a will in a specific manner, although recognized in Pennsylvania, are viewed "with misgivings and suspicion": *Vajentic Est.*, 453 Pa. 1, 7. The parties seeking to establish an oral agreement to make a specific bequest must meet exacting evidentiary burdens: *Estate of Friedman*, 483 Pa. 614, reargument denied March 20, 1979. The Supreme Court summarized these burdens in *Fahringer v. Strine Est.*, 420 Pa. 48, 53-55, and more recently in *Friedman*, supra, as follows:

"(a) a contract to make a will or to bequeath by will, as with other contracts, must be established by proof of an offer, an acceptance and legal consideration;

(b) the terms of the contract must be shown with certainty and lucidity;

(c) the evidence must be scrutinized with great care;

(d) there must be 'direct evidence' in proof of the contract;

(e) as in the case of other claims against a decedent's estate, the evidence in proof of the contract, must be clear, direct, precise and convincing."

Evidence meeting these standards must be "so clear, direct, weighty, and convincing" as to enable the fact-finder "to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue": *Stafford v. Reed*, 363 Pa. 405, 411.

The findings of fact made at the outset of this adjudication are based on the evidence presented, with the exception of the testimony of Mrs. Moore, which we find to be rendered inadmissible by the Act of April 28, 1978, P.L. 202,No. 53, 42 Pa. C.S.A. §5930, Pennsylvania's Dead Man's Act.[1] See also, *Friedman*, supra, at 626 and *Gelb Estate*, 425 Pa. 117, 122 (1967).

---

1. The Act provides in pertinent part:

"In any civil action or proceeding where any party to a thing or contract in action is dead, . . . and his right thereto or therein has passed, either by his own act or by the act of the law, to a party on the record who represents his interest in the subject in controversy, neither any surviving or remaining party to such thing or contract, nor any other person whose interest shall be adverse to the said right of such deceased or lunatic party occurring before the death of said party . . ." (with certain qualifiers not releveant here).

Without Mrs. Moore's evidence, we have at best vague allusions to the fact that Mrs. Rust was considering including (and at one point, did include) Mrs. Moore in her will. There is no evidence of an agreement to do so. The evidence is fragmentary and vague, rather than clear and convincing. Even if we could consider Mrs. Moore's testimony, the evidence still does not establish that the claimant and the decedent experienced a "meeting of the minds" as to the terms of the alleged contract, since Mrs. Moore's testimony does nothing more than establish anticipated benefactions that were never carried out.

Further, we do not believe that the estate has waived the benefit of the dead man's rule by anything it has done. The claimant argues that the estate, by offering the testimony of the corporate accountant, Mr. Shore, has waived the statute. We disagree. Mr. Shore was asked whether he knew of Mrs. Moore's initial weekly salary from Frances, Inc., and whether he knew of any change in the salary amount up to the time of the claimant's dismissal. This is not enough to constitute a waiver: first, the questions pertain only to the amount of salary received from the corporation and not to any arrangement between Mrs. Rust and the claimant. Second, even if we consider Mrs. Rust and Frances, Inc. to be interchangeable alter-egos, we are unable to find authority for the proposition that those questions on the subject of salary amount to a waiver going to the subject of a promise to make a will.

It has also been suggested that Mrs. Moore's testimony could be considered for the purpose of rebutting Mr. Shore's testimony. Since we see no disagreement between their testimony, we see no reason to receive and consider her rebuttal testimony. Accordingly, we have no choice but to dismiss Mrs. Moore's claim.